# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-764

**BETTY JEAN HARGROVE, INDIVIDUALLY
AND AS NATURAL TUTRIX OF JESSICA BANKS**

**VERSUS**

**MISSOURI PACIFIC RAILROAD COMPANY
d/b/a UNION PACIFIC RAILROAD COMPANY,
SOUTHERN PACIFIC TRANSPORTATION COMPANY,
AND TOMMY COMEAUX**

************

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT,
PARISH OF JEFFERSON DAVIS, NO. 129-97,
HONORABLE WENDELL R. MILLER, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and John B. Scofield,[*] Judges.

**AFFIRMED.**

**Elizabeth S. Hardy
Thomas & Hardy
2380 Lake Street
Lake Charles, Louisiana 70601
(337) 433-4903
Counsel for Plaintiff/Appellant:
Betty Jean Hargrove**

---

[*]John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge *Pro Tempore.*

**Thomas E. Townsley**
**Attorney at Law**
**711 Pujo Street**
**Lake Charles, Louisiana  70601**
**(337) 430-0994**
**Counsel for Plaintiff/Appellant:**
> **Betty Jean Hargrove**

**J. E. McElligott, Jr.**
**Heather K. Walker**
**Davidson, Meaux, Sonnier & McElligott**
**Post Office Drawer 2908**
**Lafayette, Louisiana  70502-2908**
**(337) 237-1660**
**Counsel for Defendants/Appellees:**
> **Southern Pacific Transportation Company**
> **Tommy Comeaux**
> **Union Pacific Railroad Company**
> **Missouri Pacific Railroad Co.**

SULLIVAN, Judge.

Plaintiffs appeal the trial court's ruling on summary judgment that their state law claims of negligence based upon excessive train speed are preempted by federal law. For the following reasons, we affirm.

**Factual Background**

On September 26, 1996, a vehicle operated by Richard Haley collided with a Union Pacific Railroad Company (Union Pacific) train at the Cary Avenue crossing in Jennings, Louisiana. Betty Jean Hargrove, a passenger in the Haley vehicle, filed this suit individually and on behalf of her daughter, Jessica Banks, also a passenger, naming as Defendants, Missouri Pacific Railroad Company d/b/a Union Pacific; Southern Pacific Transportation Company (Southern Pacific); Mr. Haley; and Tommy Comeaux, the train's operating engineer.[1] Among the allegations in Plaintiffs' petition was that the Union Pacific train was traveling at a speed that was excessive for unsafe conditions or local hazards existing at the Cary Avenue crossing.[2]

Defendants, Union Pacific and Mr. Comeaux, filed a motion for summary judgment, arguing that Plaintiffs' claims of negligence based upon the speed of the train are preempted by the Federal Railroad Safety Act (FRSA), 25 U.S.C. §§ 421-447, because the train was traveling at a speed within the guidelines set forth in 49 C.F.R. § 213.9(a). Plaintiffs responded that their claims are not preempted because many documents indicated that the railroad had lowered the speed limit for that section of track and that the train was traveling in excess of that slower speed.

---

[1]At the time of the accident, Southern Pacific owned the track on which the train was traveling. After the accident, Union Pacific acquired Southern Pacific, then sold that area of track to the Burlington Northern Santa Fe Railroad (BNSF).

[2]Another of Plaintiffs' allegations was that the warning devices at the crossing were inadequate, a claim that we previously determined was not preempted by federal law. *See Hargrove v. Missouri Pac. R.R. Co.,* 03-818 (La.App. 3 Cir. 12/17/03), 861 So.2d 903, *writ denied*, 04-187 (La. 3/26/04), 871 So.2d 349.

Plaintiffs also argued that they were entitled to an adverse inference on the issue of train speed because Union Pacific failed to preserve certain items of evidence after a timely request to do so. After a hearing, the trial court ruled in favor of Defendants, finding there existed no genuine issue of material fact that the train was traveling within the federal guidelines.

**Summary Judgment**

Appellate courts review summary judgments *de novo*, applying the same criteria as the district courts in determining the appropriateness of summary judgment. *Richard v. Hall*, 03-1488 (La. 4/23/04), 874 So.2d 131. The appellate court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). Despite the legislative mandate favoring summary judgments found at La.Code Civ.P. art. 966(A)(2), "factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor." *Willis v. Medders*, 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050. Additionally, "[b]ecause preemption is an affirmative defense, the defendant bears the burden of proof on the issue." *Anderson v. Wisconsin Cent. Transp. Co.*, 327 F.Supp.2d 969, 973 (E.D. Wisconsin 2004).

**Preemption**

In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 661-62, 113 S.Ct. 1732, 1736 (1993), the United States Supreme Court stated:

> FRSA was enacted in 1970 to "promote safety to all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons . . . ." 45 U.S.C. § 421. To aid in the achievement of these goals, the Act specifically directs the Secretary of

2

Transportation to study and develop solutions to safety problems posed by grade crossings. § 433. In addition, the Secretary is given broad powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety . . . ." § 431(a). The pre-emptive effect of these regulations is governed by § 434, which contains express saving and pre-emption clauses.

As the Supreme Court pointed out in *Easterwood*, the Secretary promulgated regulations at 49 C.F.R. § 213.9 that set maximum train speeds for different classes of track, with the classes of track being defined by gage, alignment, curvature, surface uniformity and number of crossties per length of track. The Supreme Court concluded that 49 C.F.R. § 213.9(a) "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood*, 507 U.S. at 675, 113 S.Ct. at 1743. Accordingly, the Supreme Court interpreted those regulations as not only establishing a ceiling as to train speed, but also as precluding additional state regulation, such as state law negligence claims based on excessive train speed. Thus, the Supreme Court held in *Easterwood* that the plaintiff's claim that the railroad breached a common-law duty to operate its train at a moderate and safe speed was preempted, where it was undisputed that the train was traveling within the speed limit of 49 C.F.R. § 213.9(a).

As a result of the *Easterwood* decision, a state law claim based on excessive train speed is preempted "if a train is involved in an accident while traveling under the maximum speed prescribed by § 213.9(a)." *Anderson*, 327 F.Supp.2d at 975. Similarly, as this court recognized in *Western Co. of North America v. Dynasty Transportation, Inc.*, 96-877, p. 3 (La.App. 3 Cir. 5/7/97), 696 So.2d 1, 2, "there is a large body of appellate and trial court decisions finding that state law excessive train speed claims are preempted when there is no evidence providing that the train's speed was in excess of federal regulations."

3

Since the *Easterwood* decision, however, the Federal Railroad Administration (FRA) has clarified, through publication in the Federal Register, that it only has an indirect role in determining railroad speed limits. As the FRA explained in 62 Fed.Reg. at 36143 (July 3, 1997): "Railroads set train speed in their timetables and train orders. Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed." The FRA further stated: "Notwithstanding some of the language in *Easterwood* . . . FRA has never assumed the task of setting train speed. Rather, the agency holds railroads responsible for minimizing the risk of derailment by properly maintaining track for the speed they set themselves." *Id.* at 36143-44. Since this clarification, at least one federal district court has considered, for preemption purposes, "the speed that defendant permitted its trains to operate at over such track as set forth *in its timetables, general orders and speed restrictions*." *Anderson*, 327 F.Supp.2d at 976. In *Anderson*, the court found that the railroad was not entitled to summary judgment on preemption because the record was unclear as to whether any speed restrictions were in effect at the time of the accident. Specifically, the court found that discrepancies between the depositions and affidavits of railroad employees created a factual issue, where the employees stated in their affidavits that no speed restrictions or slow orders were in place within two miles of the crossing, but testified in their depositions that they did not know whether any speed restrictions were in place.

In *Cart v. Missouri Pacific Railroad Co.*, 99-1118 (La.App. 3 Cir. 12/8/99), 752 So.2d 241, *writ denied*, 00-247 (La. 4/7/00), 759 So.2d 767, we recognized that the plaintiffs could not maintain a claim that a train was traveling too fast for the

4

actual condition of the track, where the track was officially classified at a higher level. Similarly, in *Anderson*, 327 F.Supp.2d at 976, n.6, the court recognized that "federal preemption is not lost unless the FRA track inspector downgrades a track." Thus, Plaintiffs' claims will be preempted unless the record demonstrates a genuine issue of material fact as to either the classification of the track or the speed limit in effect at the time of the accident.

In the present case, Union Pacific argues that there is no genuine issue of material of fact that the train was traveling within the maximum speed limit of 49 C.F.R. § 213.9(a) and, if relevant for preemption purposes, within any other speed restrictions or slow orders in effect that day. It is undisputed that the railroad timetable of April 14, 1996, classified the track at the Cary Avenue crossing as Class IV, for which the maximum allowable speed was 60 miles per hour under 49 C.F.R. § 213.9(a). Because this train was carrying a wide, expensive load on the date of the accident, September 26, 1996, the railroad had imposed a speed restriction of 45 miles per hour for the entire trip. The train's event recorder indicated that, at the point of impact, the train was traveling between 41 miles per hour and 44 miles per hour. Other documents indicated that, shortly after the accident, the train's operating engineer stated that the train was traveling at 45 miles per hour. Additionally, several railroad employees, including the operating engineer, the maintenance of way foreman, and the road master, testified that no slow orders were in effect on the date of the accident. The operating engineer further testified that orders for a new speed limit of 40 miles per hour were issued sometime after this accident, once that area of track had been sold to BNSF. Defendants also produced numerous slow order lists dated before and after the accident that did not cover the Cary Avenue crossing.

Plaintiffs respond that numerous other documents create a genuine issue of material fact as to whether the speed limit was lower than 45 miles per hour on the date of the accident.[3] They point to a list of 1996 track orders showing that a speed restriction of 40 miles per hour was placed on June 7, 1996, as well as to a track speed comparison table indicating that the maximum allowable speed for this area of track was 25 miles per hour in 1995 and 40 miles per hour in 1996. They also rely heavily on a report prepared for unrelated litigation in October of 1996—the "Ahlf report"—that purported to list a "current" speed restriction of 25 miles per hour for the track at the Cary Avenue crossing.[4] Plaintiffs also introduced expert testimony that the track's crossties had deteriorated by 1996 to a condition consistent with the 25-miles-per hour speed restriction listed in the Ahlf report. Finally, Plaintiffs allege that Defendants failed to preserve evidence that would have indicated whether a slow order had been issued on the date of the accident, including the dispatcher's audio tapes for that day, the conductor's book of unforeseen restrictions, and documents missing from track inspections.

After carefully reviewing the documents submitted by both parties, we find that Defendants have met their burden of showing that no genuine issue of material fact

---

[3]Defendants argue that many documents cited by Plaintiffs are not properly in the record because they were not introduced at the hearing on the motion for summary judgment, although, as Plaintiffs point out, they had been Bates-stamped and filed in the record. In *Boland v. West Feliciana Parish Police Jury*, 03-1297, p. 7 (La.App. 1 Cir. 6/25/04), 878 So.2d 808, 814, the court concluded that "as long as **affidavits** and **depositions** are filed in the record in connection with a motion for summary judgment, they may be considered by the district court and this court, whether filed with the motion or a memorandum." As to documents other than affidavits or depositions, the court found that documents that were submitted by both parties or that were offered as attachments to affidavits or depositions were also admissible. Many of the documents to which Defendants' object are admissible on this basis.

[4]Robert Ahlf, a railroad industry consultant, inspected approximately 190 miles of track that included the accident site in October of 1996, after BNSF alleged that Union Pacific had misrepresented the class of this track in a pending sale between those parties. In his report, Mr. Ahlf concluded that "this 190.6 mile line of railroad is far below a sustainable Class IV condition."

exists as to the speed limit and train's speed on the date of the accident. The documents relied upon by Plaintiffs do not indicate that a speed restriction or slow order lower than 45 miles per hour was in place on the date of the accident. As explained by Mr. Ahlf in his deposition, a slow order is usually a temporary measure designed to manage an emergency situation that will be fixed. This is illustrated in part by the list of track orders that the Plaintiffs cite. Although the document contains an obvious error, in that it lists a speed restriction placed on "06-7-96" that was to be removed on "05-29-96", it is clear that it does not refer to a permanent restriction. Similarly, the track speed comparison table also cited by the Plaintiffs is not dated, and thus, it is unclear when the 40-mile-per-hour speed limit listed in that document was in effect. Railroad employees, however, testified that the speed limit was changed to 40 miles per hour after the accident, when that area of track was sold to BNSF. Defendants also produced numerous slow order reports dated both before and after the accident that do not list an order applicable to the Cary Avenue crossing.

Concerning the Ahlf report prepared in October of 1996, Mr. Ahlf explained in his deposition that the purpose of his report was not to investigate an accident or to determine the speed limit of a particular area of track; rather, his intention was to determine whether the track structure as a whole was compliant with Class IV standards. He explained that he was concerned only with the general condition of the track, and he acknowledged that the list of slow orders and speed restrictions could have been out of date. Despite his use of the term "current" in his report, he testified that he would not have picked up on whether any order in his list had expired because that was not necessary for his report. In particular, he believed the 25-mile-per-hour order listed in that report came from an outdated map from 1995. He further testified

7

that he had no knowledge of whether a certain order was still in effect on the date of the accident; he only had evidence that at some point one did exist.

Plaintiffs also contend that they are entitled to an adverse inference as to the train speed limit because of Defendants' failure to preserve the audio tapes, the book of unforeseen track restrictions, and other items that would have indicated whether a verbal slow order was issued the day of the accident sometime after the train left its origination point. Defendants, however, have introduced the testimony of those employees who would have issued or received such an order, had one existed. Plaintiffs' expert also acknowledged that he found no evidence of a slow order in the track bulletins and warrants for that day. Considering the entirety of the record, we find Plaintiffs' reliance on the possibility of a verbal slow order to be speculative at best.

## Decree

For the above reasons, the judgment of the trial court is affirmed. Cost of this appeal are assessed to Plaintiffs-Appellants.

**AFFIRMED.**

8