207 P.3d 1282 (2009)
Alizon VEIT, Appellant,
v.
BURLINGTON NORTHERN SANTA FE CORPORATION, a Texas Corporation, Respondent.
No. 60126-1-I.
Court of Appeals of Washington, Division 1.
June 1, 2009.
*1283 Douglas R. Shepherd, Law Offices of Douglas R. Shepherd, Bellingham, WA, for Appellant.
Tom Montgomery, Bradley Patrick Scarp, Kelsey E. Endres, Montgomery Scarp MacDougall PLLC, Seattle, WA, and Wayne L. Robbins, Attorney at Law, for Respondent.

PUBLISHED OPINION IN PART
SCHINDLER, C.J.
¶ 1 Alizon Veit was seriously injured when a Burlington Northern Santa Fe Railroad freight train collided with her car at the Pine Street crossing in Bellingham. Veit sued the City of Bellingham (the City) and the Burlington Northern Santa Fe Railroad Corporation (BNSF) for damages. Veit alleged that the City and BNSF negligently designed and maintained the Pine Street crossing. Veit also alleged that the BNSF engineer negligently operated the train at an unreasonable and excessive speed. The trial court denied the railroad's motion to dismiss Veit's negligent design and maintenance claims on summary judgment, but granted the motion to dismiss her excessive speed claims. There was no dispute that the train was traveling at a speed that was less than 40 miles per hour. Because the court concluded that the track was designated as Class 3 with a federally imposed speed limit of 40 m.p.h., the court ruled that under CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), Veit's excessive speed claims were preempted by the Federal Railroad Safety Act of 1970 (FRSA). After a three week trial, the jury returned a verdict in favor of BNSF. On appeal, Veit contends the trial court erred in dismissing her excessive speed claims and excluding evidence of the railroad's internal speed limits. Veit also contends that the exceptions to preemption that the Supreme Court noted in Easterwood apply. In addition, Veit claims that the trial court erred in denying her request for a jury instruction on spoliation, allowing witnesses to testify about driving across the railroad tracks at the Pine Street crossing, and refusing to instruct the jury on the duty to have flashing lights at the crossing.
¶ 2 If a train is traveling at or below the maximum speed prescribed by the FRSA, state law claims based on excessive speed are preempted unless the State adopts a more stringent speed limit in order to eliminate "an essentially local safety hazard" or the train was traveling too fast to avoid a "specific, individual hazard." Because reasonable minds could only conclude that the track at the Pine Street crossing was designated as Class 3, with a maximum speed limit of 40 m.p.h., and there was no evidence that the crossing was either designated as a local safety hazard or that there was a specific individual hazard, we affirm summary judgment dismissal of the excessive speed claims and the court's decision to exclude evidence of the railroad's internal speed limits. We reject Veit's other claims of error, affirm the jury verdict, and entry of the final judgment.

FACTS
¶ 3 At approximately 11:40 a.m. on September 10, 2001, Alizon Veit drove her manual transmission Mercedes Benz west on Wharf Street toward the Pine Street railroad crossing (Pine Street crossing). Wharf Street curves right before becoming Pine Street. At the Pine Street crossing there is a two lane paved asphalt roadway with two sets of railroad tracks. The track closest to the Pine Street crossing is a railroad yard or "spur" track. The second track is the main railway line. The two tracks are located approximately 30 feet apart. To the south of the Pine Street crossing is an embankment with vegetation on it. There were seven different signs and markings at the Pine Street crossing to warn westbound vehicles. The warnings included a round "RXR" sign, an "X" with lines painted on the street, a *1284 Highway Rail Grade Crossing ("crossbuck")[1] sign, a smaller sign that says "2 TRACKS", a sign that says "NO STOPPING ON TRACKS," a "STOP" sign, and painted pavement markings including a crossbuck and a stop line.
¶ 4 The weather was clear and the roadway was dry. The engineer of the BNSF train, Michael Burks, first sounded the train whistle approximately a quarter mile south of the Pine Street crossing. One eyewitness testified that Veit slowed down, but did not completely stop, and drove slowly, in a "hesitant... kind of jerking with the car," eventually stopping on the second set of tracks in the path of the moving train. Burks testified that he first saw Veit's car when it was about 150 feet away from the Pine Street crossing. Because it appeared that Veit was going to drive across the tracks. Burks said that he sounded a long whistle signal, hit the emergency brakes, and attempted to make an emergency stop. Burks testified that the train was traveling at approximately 20 m.p.h. when it hit Veit's car.
¶ 5 When the police arrived, Veit was unconscious and unresponsive, but still breathing. Veit's car was heavily damaged from the impact. The left front door was crushed inward and the windows were shattered. The manual transmission of the car was in third gear. When an officer replaced the batteries in Veit's portable radio, classical music began to play at level three. Veit suffered head and chest injuries, as well as multiple leg fractures.
¶ 6 In September 2004, Veit's court appointed guardian sued the City, BNSF, and the BNSF train engineer for damages. Veit alleged that the City and BNSF breached their duty to adequately design the Pine Street crossing and negligently maintained the right-of-way.[2] Veit alleged that the placement of the stop bar and the vegetation on the embankment created a hazard that prevented a driver from seeing the approaching train. Veit also alleged that the BNSF engineer negligently operated the train at an unreasonable and excessive speed.
¶ 7 The City filed a motion for summary judgment asserting there was no evidence that the Pine Street crossing was negligently designed or maintained, and the City did not have notice that the vegetation on the embankment impaired a driver's ability to see an approaching train. BNSF joined in the City's motion for summary judgment. BNSF also argued there was no evidence that the crossing was negligently designed or that the vegetation blocked a driver's line of sight and that the embankment was not part of the BNSF right-of-way.
¶ 8 In addition, BNSF argued that Veit's excessive speed claims were preempted by federal law. There was no dispute that the train was traveling far below 40 m.p.h. when it collided with Veit's car. BNSF presented evidence establishing that under federal law, the track at the Pine Street crossing, which is located at milepost 96.2, was designated as Class 3 with a speed limit of 40 m.p.h.
¶ 9 John Leeper, the BNSF Director of Engineering Planning, stated that on the date of the accident, "the segment of track where the incident occurred was designated Class 3...."
¶ 10 Carl Johnson, the full time track inspector for the BNSF Northwest Division in Bellingham, FRSA explained the difference between the mandated speed limit and the internal speed limits set by BNSF: "The [FRSA] maximum allowable speed limit for freight trains traveling on Class 3 track is 40 m.p.h. The BNSF maximum authorized speed for freight trains on the track segment between MP [mile post] 93.6 to 96.7 is 30 m.p.h., with a 20 m.p.h. head end restriction at MP 96.2 (Pine Street crossing)."
*1285 ¶ 11 Alex Franco, Jr., the BNSF Northwest Division Roadmaster, also stated that the Pine Street crossing at "milepost 96.2 had a head-end timetable speed restriction of 20 m.p.h." and that "BNSF typically sets its internal speed limits lower than federal law requires." Franco stated that the head-end restriction imposed by BNSF "means a BNSF train must travel at or below the indicated speed when the front of its head locomotive first enters the crossing."
¶ 12 In opposition, Veit relied on a report that was prepared after the accident by BNSF trainmaster Terrence Nies, to argue that because the track was designated as a Class 2 track with a speed limit of 25 m.p.h., federal law did not preempt her excessive speed negligence claims. Veit also argued that violation of BNSF's internal speed limits was evidence of negligence. As to the negligent design and maintenance claims, Veit asserted that under the Manual on Uniform Traffic Control Devices published by the United States Department of Transportation Federal Highway Administration (the MUTCD), BNSF and the City had a duty to provide adequate warning signals and were jointly responsible for the right-of-way.
¶ 13 In reply, BNSF submitted a declaration from Nies. Nies testified that the statement in the accident report that the track at the Pine Street crossing was designated as Class 2 track was a mistake, and the track designation at the Pine Street crossing "was, and still is, Class 3." Nies also stated that the 20 m.p.h. head-end restriction was "not a speed limit, but the speed that BNSF dictates the `head end' of the train must go only as it enters the crossing."
¶ 14 The City settled with Veit before the summary judgment hearing. The trial court denied the railroad's motion to dismiss Veit's negligent design and maintenance claims because there were disputed issues of material fact. However, the court concluded that because the track at the Pine Street crossing was designated as Class 3 with a speed limit of 40 m.p.h., Veit's excessive speed claims were "preempted by federal law."[3]
¶ 15 For the first time in the motion for reconsideration, Veit argued that because her excessive speed claims were based on "obstruction to view," the "essentially local safety hazard" or the specific individual hazard exceptions noted in Easterwood precluded summary judgment. The court denied Veit's motion for reconsideration, but allowed her to present evidence at trial to seek to establish that the exceptions under Easterwood applied and the crossing was a local safety hazard or a specific individual hazard. Before trial, the court granted the railroad's motion to exclude evidence of negligence based on the BNSF internal speed limits.
¶ 16 Over the course of the three week jury trial, lay and expert witnesses testified about the accident, the Pine Street crossing, and Veit's condition before and after the accident. Veit claimed BNSF was negligent in (1) failing to exercise reasonable care in designing the railroad crossing, (2) failing to exercise reasonable care in maintaining the right-of-way, (3) failing to exercise reasonable care in providing warnings, and (4) failing to exercise reasonable care in operating the train given the hazardous conditions at the crossing.
¶ 17 Veit has no recollection of the accident and did not testify. Two women, who work in the building across the street from the Pine Street crossing, saw the accident from an office on the second floor of their building. Jennifer Hendricks said that she heard the train whistle and was "pretty sure" Veit stopped at the stop sign. Hendricks said that Veit slowly drove over the first track and stopped on the second track. At that point, Hendricks called 911 because she knew the train was going to hit Veit's car. Hendricks testified that, before the train hit the car, Veit looked "scared to death."
¶ 18 LaDawn Ramsey testified that as the train approaches the Pine Street crossing, the train whistle is very loud. Ramsey said Veit slowed down before crossing the tracks, but "was not completely stopped." Ramsey testified that Veit drove across the tracks very slowly and was "jerking with the car." Ramsey also said that Veit seemed "confused." According to Ramsey, after Veit hesitated, she drove her car onto the second track, and then stopped.
*1286 ¶ 19 Veit's friend and neighbor, Grant Wilder, testified that the car had a manual transmission and that Veit may have stalled the car while driving across the railroad tracks. Wilder said that Veit was "a terrible driver." Wilder testified that after Veit's husband died, he had to help Veit back her car out of the driveway because otherwise "she would always go in the bushes."
¶ 20 Another witness who had carpooled with Veit, also testified that Veit was "not a smooth driver" and "was a little bit jerky when she passed gears[.]" Veit's human factor expert testified that "when the vehicle was, was examined, it was found to be in third gear. That did not seem to be a rational gear for someone who is trying to get off the track quickly."
¶ 21 The highest speed that any witness estimated the train was traveling was 33 m.p.h. The brakeman on the train, William Davis, testified that at the time of the accident, the train was traveling at or near 20 m.p.h. Consistent with the pretrial ruling, that the track was designated Class 3 with a speed limit a 40 m.p.h., the court denied Veit's request to present Burks's testimony that he believed the federal speed limit at the crossing was 20 m.p.h.
¶ 22 The crux of Veit's negligent design and maintenance claims was that the painted stop bar violated the MUTCD and was located too close to the tracks for a driver to safely see a train approaching from the south and the vegetation on the embankment next to the crossing blocked the driver's line of sight. Veit also presented testimony seeking to show that the Pine Street crossing was hazardous and the crossing was "extremely dangerous or inherently dangerous."
¶ 23 Veit's transportation engineering expert, Edward Stevens, testified that the City and BNSF were jointly responsible for the markings and the signals at the Pine Street crossing and the crossing was inherently dangerous. Stevens stated that the location of the stop bar violated the MUTCD and the vegetation on the embankment prevented a driver from seeing a train approaching from the south. However, Stevens admitted that the placement of the stop bar was the sole responsibility of the City and the railroad had no responsibility for the markings at the crossing.
¶ 24 Thomas Rosenberg, an engineer with the City of Bellingham Public Works Department, also testified about the location of the stop bar and the embankment at the Pine Street crossing. Rosenberg testified that the City, not BNSF, was solely responsible for placement of the stop bar. Rosenberg said that he had "no idea" who owned the embankment but that the property owner was responsible for cutting down the vegetation near the crossing. Rosenberg also testified that the State had not designated the Pine Street crossing as a local safety hazard or as extremely dangerous.
¶ 25 Veit also asked a number of lay witnesses about driving across the tracks at the Pine Street crossing and whether the crossing was dangerous. On cross examination, the witnesses testified about their experiences in safely crossing the railroad tracks at Pine Street crossing.
¶ 26 Mary Wilder, a close friend of Veit's, testified that after the accident Veit was a "whole different person" and she had to learn how to do everything again, including how to swallow and eat. Veit required 24 hour care, physical therapy, psychotherapy, occupational therapy, and a number of medications. The jury also watched a DVD showing Veit's condition.
¶ 27 A professional land surveyor, Bruce Ayers, testified on behalf of BNSF. Ayers testified that the BNSF right-of-way consisted of a 14 foot strip that extended seven feet from the center line of the first set of tracks. Toward the end of the trial, Timothy Wahl, a City Parks and Recreation Department employee, testified that upon further investigation, the City, not BNSF, owned the embankment at the Pine Street crossing.
¶ 28 The court instructed the jury on negligence, contributory negligence, and the requirements of the MUTCD concerning traffic controls, the location of the stop bar, and the duty of the railroad to maintain the right-of-way. The court also instructed the jury that "the applicable train speed limit at the Pine Street crossing on September 10, 2001 was 40 miles per hour." In the special verdict *1287 form, the jury found that BNSF was not negligent. As directed, the jury did not answer the questions as to contributory negligence or damages. The court entered a final judgment on the jury verdict dismissing Veit's lawsuit against BNSF. The court denied Veit's motion for judgment notwithstanding the verdict or a new trial. Veit appeals.

ANALYSIS

Excessive Speed
¶ 29 Veit contends that the trial court erred in ruling on summary judgment that the Pine Street crossing was designated as a Class 3 track with a speed limit of 40 m.p.h. Veit also contends that the court erred in excluding evidence of the internal speed limits as set forth in the BNSF timetable and the testimony of the train engineer that he believed that the internal speed limits were the "maximum speeds allowed by federal law."
¶ 30 We review summary judgment de novo and engage in the same inquiry as the trial court. Heath v. Uraga, 106 Wash.App. 506, 512, 24 P.3d 413 (2001). Summary judgment is proper if the pleadings show the moving party is entitled to judgment as a matter of law or in view of all the evidence, reasonable persons could reach only one conclusion. CR 56(c); Hansen v. Friend, 118 Wash.2d 476, 485, 824 P.2d 483 (1992). Whether federal law preempts Veit's claim that BNSF negligently operated the train by traveling at an unreasonable and excessive speed is a question of law that we review de novo. Berger v. Sonneland, 144 Wash.2d 91, 26 P.3d 257 (2001).
¶ 31 Congress enacted the Federal Railroad Safety Act of 1970 (FRSA), 49 U.S.C. §§ 20101-40, "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA provides a comprehensive system to regulate railroads and gives the Secretary of Transportation broad authority to adopt regulations and issue orders for "every area of railroad safety." 49 U.S.C. § 20103(a). The FRSA also directs the Secretary to "develop and carry out solutions to the railroad crossing problem." 49 U.S.C. § 20103(a).
¶ 32 The FRSA also contains an express preemption provision that displaces State authority to regulate railroad safety when the Secretary of Transportation adopts a regulation or an order covering the subject matter of the state's requirements. However, the preemption provision allows a state to adopt or continue in force a more stringent law or regulation if it is necessary to eliminate or reduce "an essentially local safety hazard" as long as it is not incompatible with "a law regulation, or order of the United States Government." 49 U.S.C. § 20106(a)[(1)-(2)]. The FRSA preemption provision provides:
Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.[4]
¶ 33 As part of the regulatory system under the FRSA, the Secretary of Transportation issued regulations establishing the maximum allowable speeds for freight trains and passenger trains based on the designated class of track. 49 C.F.R. § 213.9(a). 49 C.F.R. § 213.9 codifies requirements and maximum allowable speeds for Class 1 to Class 5 railroad tracks. The class of a track is determined by a number of factors including the gage of the alignment, curvature, and uniformity. 49 C.F.R. § 213.9.
¶ 34 In Easterwood, the United States Supreme Court held that 49 C.F.R § 213.9 "cover[s] the subject matter of train speed with respect to track conditions, including the conditions posed by [railroad] crossing." Easterwood, 507 U.S. at 675, 113 S.Ct. 1732. After her husband was killed while driving across the tracks at a railroad crossing, Easterwood sued, alleging that the railroad failed to maintain adequate warning devices at the crossing and the railroad breached its duty *1288 to operate the train "at a moderate and safe rate of speed." Easterwood, 507 U.S. at 661, 113 S.Ct. 1732. The Court held that Easterwood's negligence claims as to the warning devices at the crossing were not preempted, but her excessive speed claims were preempted by the regulations adopted by the Secretary of Transportation under 49 C.F.R. § 213.9. Easterwood, 507 U.S. at 673-74, 113 S.Ct. 1732.
¶ 35 The Court rejected Easterwood's argument that the state law speed restrictions continued in force under the "essentially local safety hazard" language.
The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. Respondent's contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434.
Easterwood, 507 U.S. at 673-74, 113 S.Ct. 1732.
¶ 36 The Court concluded that the regulations and orders issued by the Secretary of Transportation to enforce the FRSA "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings" and were only adopted "after the hazards posed by track conditions were taken into account." Easterwood, 507 U.S. at 674, 113 S.Ct. 1732
On their face, § 213.9(a)'s provision address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.
Easterwood, 507 U.S. at 674, 113 S.Ct. 1732. However, the Court also expressly noted that "related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard" might not be preempted. Easterwood, 507 U.S. at 675 n. 15, 113 S.Ct. 1732.[5]
¶ 37 In short, if a train is involved in a collision while traveling at the speed limit prescribed under C.F.R. § 213.9, state law negligence claims based on excessive speed are preempted unless the crossing is designated by the State as an essentially local safety hazard or the conditions create a specific individual hazard.
¶ 38 Veit concedes there is no evidence that the BNSF freight train was traveling in excess of 40 m.p.h., but argues there are material issues of fact about whether the track at the Pine Street crossing was designated as a Class 2 or a Class 3 track. 49 C.F.R. § 213.9 provides that the maximum allowable speed for a freight train for a Class 2 track is 25 m.p.h. and the maximum allowable speed for a Class 3 track is 40 m.p.h.
¶ 39 The trial court ruled that based on the evidence at summary judgment, reasonable minds could only conclude that the track at the Pine Street crossing was designated as Class 3: "All the competent evidence I have is that it was a Class 3 track and has a 40 mile an hour speed limit." The trial court relied on the declaration of BNSF trainmaster Nies in rejecting Veit's reliance on the misstatement in his accident report that the track designated as was Class 2.
[T]here was always a very clear declaration that indicated that was an error. It *1289 doesn't matter whether BNSF makes an error in the report or not. What the federal government determines that to be the speed limit [sic] there is what counts and ... the only competent evidence I have is that it is, in fact, a Class 3 track. I have no evidence from anybody else that says it's not."
¶ 40 Veit's argument that the report creates a material issue of fact as to the classification of the track ignores Nies's declaration retracting his statement that the crossing was Class 2. In the declaration, Nies testifies that his statement about the track classification was a mistake and the crossing "was, and still is, Class 3."
¶ 41 Veit also argues that the declarations of Leeper and Johnson stating that the crossing was designated as a Class 3 track lack foundation because the witnesses addressed the classification of the track in 2006 and not at the time of the accident. But Leeper specifically states, "On the date of the accident in this case, the track segment was Class 3." And Johnson states "On the date of the accident in this case, I verified the Bellingham subject track segment was within FRA Class 3 standards." Based on the evidence at summary judgment, reasonable minds could only conclude that the track at the Pine Street crossing was a designated as a Class 3 track, not Class 2.
¶ 42 In the alternative, Veit relies on Missouri Pac. R. Co. v. Lemon, 861 S.W.2d 501 (Tex.App.1993), to argue that her excessive speed claims were not preempted because the train engineer had a duty to slow or stop to avoid a "specific, individual hazard." Easterwood, 507 U.S. at 675 n. 15, 113 S.Ct. 1732.
¶ 43 Courts have defined a specific individual hazard as "a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing and which is not capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations." Myers v. Missouri Pac. R.R. Co., 52 P.3d 1014, 1027 (Okla.2002). A specific individual hazard is a unique occurrence rather than a generally dangerous condition.
¶ 44 Veit's reliance on Lemon is unpersuasive. In Lemon, a line of tank cars were improperly parked within 105 feet of the crossing. Even though the tank cars obstructed the engineer's view of the intersection, the engineer did not slow down the train. Lemon, 861 S.W.2d at 510. The jury found the railroad was negligent based on the engineer's failure to reduce the train's speed even though the "illegally and improperly parked tank cars" obstructed his view of the crossing. Lemon, at 509-10. The court held that the illegally parked tank cars created a specific, individual hazard because "[t]he improper parking of tank cars which obstruct the view of a crossing is not a hazard which the Secretary took into consideration when determining train speed limits under the FRSA." Lemon, 861 S.W.2d at 510. Here, unlike in Lemon, the evidence established that BNSF was not responsible for the vegetation on the embankment. And the evidence did not establish "a unique occurrence which could lead to a specific and imminent collision and not to allegedly dangerous conditions at a particular crossing." Myers, 52 P.3d at 1027 (Okla.2002).
¶ 45 Veit also appears to argue that the "essentially local safety hazard" exception noted in Easterwood applies. As interpreted by the Ninth Circuit, an essentially local safety hazard is a local safety concern "which is not `adequately encompassed within national uniform standards.'" Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n, 346 F.3d 851, 860 (9th Cir.2003). Veit cites a former Washington Administrative Code (WAC) provision in support of her argument that the Pine Street crossing was designated as an essentially local safety hazard. Former WAC 480-62-155 required the City to determine whether a lower speed limit than the federal speed limit was necessary to eliminate or reduce an essentially local safety hazard. But even if WAC 480-62-155 applied, the testimony at trial established that the City had not designated the Pine Street crossing as a local safety hazard.
¶ 46 Citing a Washington Supreme Court case decided thirty years before Easterwood, Goodner v. Chicago, M., St. P. & P.R. Co., 61 Wash.2d 12, 19, 377 P.2d 231 (1962), Veit also contends that the trial court erred in excluding evidence of the internal speed limits set in the BNSF timetables. In Goodner, the *1290 court held that violation of a railroad's internal speed limit was evidence of negligence. Goodner, 61 Wash.2d at 19, 377 P.2d 231. While a violation of the railroad's internal speed limits may be evidence of negligence under state law, under Easterwood, the federal regulations which specify the speed limits for different types of track preempt state law negligence claims based on excessive speed. Easterwood, 507 U.S. at 673-74, 113 S.Ct. 1732; See also St. Louis Soutwestern Ry. Co. v. Pierce, 68 F.3d 276, 278 (8th Cir.1995) (railroad's self-imposed speed limit of 45 m.p.h. was preempted by the Federal Safety Act speed limit of 60 m.p.h.); Mott v. Missouri Pac. R. Co., 926 S.W.2d 81, 85 (Mo.App. W.D.1996) ("The railroad's alleged violation of a self-imposed speed limit should not have been submitted to the jury.").[6]
¶ 47 We affirm the trial court's decision that the Pine Street Crossing was designated as a Class 3 track with a speed limit of 40 m.p.h., and that under Easterwood, Veit's excessive speed claims were preempted. We also affirm the trial court's decision to exclude testimony of the internal speed limits in the BNSF timetables.
¶ 48 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.
WE CONCUR: DWYER, A.C.J., and AGID, J.
NOTES
[1] Crossbucks are "black-and-white, X-shaped signs that read `RAILROAD CROSSING.'" See Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344, 350, 120 S.Ct. 1467, 1472, 146 L.Ed.2d 374 (2000).
[2] Veit also alleged that because the crossing was "extrahazardous," the City and BNSF were strictly liable for her injuries. A railroad crossing is extrahazardous when a prudent driver, operating at a reasonable speed, is unable to avoid a collision due to the inability to timely observe the train. Cain v. St. Louis-San Francisco R. Co., 293 P.2d 355 (Okla.1955) (holding that a crossing was not extrahazardous when the railroad failed to give warning signals, use lights, despite the curvature of the tracks and vegetation). Veit does not appeal the court's summary judgment dismissal of her extrahazardous claim.
[3] The court also dismissed the claims against the train engineer, Burks, with prejudice.
[4] In August 2007, Congress amended the FRSA to clarify the preemptive effect of the FRSA and state causes of action. 49 U.S.C. § [20106(b)-(c)]. The amendment is not raised by the parties and is not pertinent to the analysis in this case.
[5] Courts have consistently followed Easterwood in holding that excessive speed negligence claims under state law are preempted by federal law. See e.g., Michael v. Norfolk Southern Ry. Co., 74 F.3d 271, 273 (11th Cir.1996) ("Any state law claim based on the train's alleged excessive speed is preempted by federal law, specifically the train speed regulations set out in 49 C.F.R. § 213.9."); Waymire v. Norfolk and Western Ry. Co., 218 F.3d 773, 776 (7th Cir.2000) ("Waymire's negligence claim based upon the speed of the train is superseded by FRSA and the regulations promulgated thereunder"); Hargrove v. Missouri Pac. R.R. Co., 888 So.2d 1111, 1114 (La.App. 3 Cir. 12/1/04) (under Easterwood, federal regulations preempt "state law negligence claims based on excessive train speed.")
[6] For the first time in her reply brief, Veit cites Anderson v. Wisconsin Cent. Transp. Co., 327 F.Supp.2d 969 (E.D.Wis.2004) and a provision in 49 C.F.R. § 213.9, to argue that railroads establish track classification and speed limits in the timetables. We do not consider arguments made for the first time in a reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992). See also Dickson v. U.S. Fid. & Guar. Co., 77 Wash.2d 785, 787-88, 466 P.2d 515 (1970) ("Contentions may not be presented for the first time in a reply brief.").