[No. 83385-1.    En Banc.]
Argued October 19, 2010.    Decided February 24, 2011.

ALIZON VEIT, *Petitioner*, v. BURLINGTON NORTHERN SANTA FE CORPORATION, *Respondent*.

*Edward S. Alexander* and *Douglas R. Shepherd* (of *Shepherd Abbott Alexander*); and *Kenneth W. Masters* and *Shel-*

*by R. Frost Lemmel* (of *Masters Law Group PLLC*), for petitioner.

*Tom Montgomery, Bradley P. Scarp*, and *Kelsey E. Endres* (of *Montgomery Scarp MacDougall PLLC*); and *Paul J. Lawrence* and *Gregory J. Wong* (of *K&L Gates LLP*) (*Wayne L. Robbins Jr.* of *Burlington Northern Santa Fe Railway Law Department*, of counsel), for respondent.

¶1 MADSEN, C.J. — Alizon Veit brought suit against Burlington Northern Santa Fe Corporation (BNSF) after a train collided with her car at a railroad crossing, resulting in serious injuries. She alleged, among other claims, that BNSF was negligent in exceeding internally imposed speed limits. The trial court granted partial summary judgment in favor of BNSF, holding that Veit's common law excessive speed claim was preempted by federal law because the train was traveling below the federal speed limit at the time of the accident.

¶2 The case proceeded to trial, and the jury found that BNSF was not negligent. Veit appealed, challenging the trial court's summary judgment ruling as well as the trial court's failure to admit evidence at trial as to her exercise of due care at the crossing where the accident occurred.

¶3 The Court of Appeals affirmed, declining to address issues Veit had raised regarding her compliance with traffic safety laws because they were a matter of contributory negligence and the jury had found that BNSF was not negligent. We affirm the Court of Appeals.

FACTS AND PROCEDURAL HISTORY

¶4 On September 10, 2001, Alizon Veit was injured when her car collided with a freight train operated by BNSF at

the Pine Street crossing in Bellingham, Washington. In 2003, Ms. Veit, by and through David M. Nelson, her court appointed guardian, brought suit against BNSF; the city of Bellingham; and the marital community of Michael Burks, the BNSF engineer who was operating the train.

¶5 Ms. Veit claimed that BNSF failed to exercise reasonable care in designing the railroad crossing, maintaining visibility at the crossing, operating the train at the crossing, and warning the public as to oncoming trains; and she further claimed that the railroad's negligence was the proximate cause of her injuries. She also alleged that the crossing was ultrahazardous and therefore that defendants were strictly liable for her injuries. BNSF denied any negligence and raised the affirmative defense of contributory negligence.

¶6 BNSF moved for summary judgment, arguing that Veit's excessive speed claims were preempted by federal law. In particular, BNSF maintained, regardless of its compliance or noncompliance with self-imposed speed limits, the train that collided with Veit's car was traveling below 40 miles per hour, the federal speed limit for freight trains on class 3 tracks. In support of BNSF's motion for summary judgment, John Leeper, director of engineering planning for BNSF, submitted a declaration asserting that BNSF had designated the stretch of track where Veit's accident occurred a class 3 track, based on the maximum allowable speed. Similarly, Carl Johnson, a track inspector for BNSF, submitted a declaration indicating that the track segment at the Pine Street crossing was designated a class 3 track, that the federal speed limit for freight trains on class 3 tracks was 40 miles per hour, and that BNSF's internal speed limit at the Pine Street crossing was 30 miles per hour, with a head-end restriction of 20 miles per hour.[1] Alex Franco Jr., a roadmaster for BNSF, submitted a declaration distinguishing the speed limits found in BNSF's

---

[1] Head-end restrictions specify the maximum speed at the moment the front of the head locomotive first passes through the crossing. Clerk's Papers at 1923.

timetables from federally imposed speed limits and indicating that "BNSF typically sets its internal speed limits lower than federal law requires." Clerk's Papers (CP) at 1923. In addition, Terrence L. Nies, a trainmaster for BNSF in Bellingham, submitted a declaration stating that the segment of track at the Pine Street crossing was a class 3 track and that he had erred when he indicated on an accident report form that it was a class 2 track.

¶7 The court granted the defendants' motion for summary judgment on the issue of excessive speed. Veit later moved unsuccessfully for reconsideration.

¶8 The city of Bellingham settled with Veit before trial, and the trial court dismissed Veit's claims against Mr. Burks with prejudice. *Veit v. Burlington N. Santa Fe Corp.*, 150 Wn. App. 369, 376-77, 207 P.3d 1282 (2009) (published in part).

¶9 Prior to trial, BNSF moved in limine to preclude Veit "from arguing that BNSF violated any speed laws, or that traveling in excess of BNSF's internal speed limit of 30 m.p.h. or the head end restrictions of 20 m.p.h. was in any way wrong or improper, or that Ms. Veit's accident was caused in any way by the train traveling an excessive speed." CP at 517. The trial judge admitted only evidence as to actual speed and excluded all evidence as to BNSF's internal speed limits.[2] Consequently, Veit was unable to introduce BNSF's timetable, which indicated that at the time of the accident, the internal speed limit at the Pine Street crossing was 30 miles per hour, with a head-end restriction of 20 miles per hour.

¶10 The trial court also excluded testimony by Burks, the BNSF engineer who was operating the train that collided with Veit's car. According to Veit's offer of proof, Mr. Burks would have testified as follows:

---

[2] Initially, the trial court ruled that Veit could present evidence as to BNSF's internal speed limits, provided Veit did not allege negligence based on excessive speed. Later, however, the court reversed its initial ruling and ruled that federal law preempted all evidence as to BNSF's internal speed limits.

I understood and believed that the federal speed limit south of the crossing was 30 miles per hour and I understood and believed that the federal speed limit at the crossing was 20 miles per hour . . . [b]ecause those were the speed limits described on the July 19, 1999 Timetable No. 3, which speeds I was told by BNSF supervisors were the maximum speeds allowed by federal law.

Pet. for Review at A32.

¶11 BNSF brought a motion in limine to exclude references to RCW 46.61.345, which requires drivers to stop "within fifty feet but not less than fifteen feet from the nearest rail of the railroad" when a "particularly dangerous" railroad crossing has a stop sign. Over Veit's strenuous objections, the trial court ruled that the statute would be inadmissible unless a city employee testified that the crossing in question was designated "particularly dangerous."

¶12 Ms. Veit did not testify at trial, having no recollection of the accident. However, the jury heard testimony from two eyewitnesses. According to Jennifer Hendricks, Ms. Veit stopped before driving onto the tracks. However, another witness, LaDawn Ramsey, was less certain that Ms. Veit had reached a full stop before driving onto the tracks. Ms. Ramsey also testified that Ms. Veit "appeared confused by the actions of the car" and was "hesitant" and "jerking" in the moments before the collision. 4 Verbatim Report of Proceedings (VRP) (Mar. 13, 2007) at 596.

¶13 Veit also called Gerson J. Alexander, a human factors analyst. Mr. Alexander testified that Ms. Veit's car was found in third gear after the accident. While he noted that third gear was not a rational gear for quickly moving off the tracks to avoid an oncoming train, he opined that due to the defective design of the crossing, Ms. Veit "was put into an untenable position, and she responded foreseeably but inappropriately." 3 VRP (Mar. 12, 2007) at 519-20.

¶14 Grant Wilder, Ms. Veit's friend, testified that Ms. Veit was a poor driver and that he used to help her back her car down her driveway after her husband passed away.

¶15 Various expert witnesses testified as to conditions, safety features, and potential shortcomings of the railroad crossing and the surrounding traffic controls. For example, Edward Stevens, a private consulting transportation engineer, testified that the stop bar was located dangerously close to the railroad tracks, in violation of industry standards, which require the stop bar to be placed at least 15 feet away from the nearest tracks. Thomas Lee Rosenberg, who worked for the city of Bellingham's public works department, testified that the city had never "made an official finding or declaration" designating the Pine Street crossing as an extremely dangerous crossing. 2 VRP (Mar. 8, 2007) at 245. He also testified that placing the stop bar 15 feet away from the nearest tracks, per industry standards, would have been problematic from a visibility standpoint.

¶16 The jury also heard various estimates as to the actual speed of the train just before the collision. The highest estimate a witness provided was 33.2 miles per hour.

¶17 As a result of BNSF's motion in limine to exclude references to RCW 46.61.345, counsel for Veit was unable to reference the statute in his opening statement and unable to inquire about the statute in cross-examining three witnesses who suggested that Ms. Veit had a duty to stop at the stop bar (located less than five feet from the nearest rail).

¶18 Near the end of trial, on Veit's motion, the trial court reversed itself and instructed the jury on RCW 46.61.345. The jury instructions indicated that under Washington law, when a stop sign is erected at a railroad crossing, the driver must stop between 50 and 15 feet from the nearest rail and thereafter proceed with due care. In addition, the instructions provided that the violation of a statute or administrative rule may be considered evidence of negligence, that the *Manual on Uniform Traffic Control Devices for Streets and Highways* (MUTCD) has the authority of law under an administrative rule in Washington, and that the MUTCD recommends that stop bars at railroad crossings be placed 15 feet from the nearest rail. During his closing argument,

Veit's counsel repeatedly argued that Ms. Veit was in compliance with Washington law when she stopped 15 feet from the nearest rail. In particular, he argued in closing that Veit's compliance with traffic regulations supported her negligence claims.

¶19 The trial court also instructed the jury on both negligence and contributory negligence. The jury instructions included the definition of proximate cause and indicated that an injury could have more than one proximate cause. The special verdict form required the jury to make a determination as to Veit's contributory negligence only if it found that BNSF was negligent and that BNSF's negligence was a proximate cause of Veit's injuries.

¶20 After very brief deliberations, the jury found that BNSF was not negligent. Thus, it did not reach the other interrogatories on the special verdict form, including the issue of contributory negligence.

¶21 On appeal, Veit challenged the trial court's initial ruling that precluded her from referencing RCW 46.61.345. In a footnote, the Court of Appeals declined to reach this issue. "Because the jury did not reach the question of Veit's negligence or damages, we need not address the assignments of error concerning contributory negligence or damages." *Veit*, 2009 Wash. App. LEXIS 1275, at *38 n.10.

¶22 Veit also challenged the trial court's grant of summary judgment for BNSF on the issue of excessive speed. The Court of Appeals affirmed. *Veit*, 150 Wn. App. at 373.

## ANALYSIS

¶23 We review grants of summary judgment de novo. *Oltman v. Holland Am. Line USA, Inc.*, 163 Wn.2d 236, 243, 178 P.3d 981 (2008). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law." CR 56(c). In undertaking review, we view all facts and inferences in the light most favorable to the nonmoving party. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). Preemption is a question of law and, accordingly, we engage in de novo review. *McCurry v. Chevy Chase Bank, FSB*, 169 Wn.2d 96, 100, 233 P.3d 861 (2010).

¶24 This court reviews a trial court's evidentiary rulings under an abuse of discretion standard. *Univ. of Wash. Med. Ctr. v. Dep't of Health*, 164 Wn.2d 95, 104, 187 P.3d 243 (2008). A trial court abuses its discretion when the ruling is " 'manifestly unreasonable or based upon untenable grounds or reasons.' " *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010) (quoting *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)). An error is harmless if it is " 'trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.' " *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 311, 898 P.2d 284 (1995) (emphasis omitted) (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)).

I. Preemption

¶25 "Under the preemption doctrine, states are deemed powerless to apply their own law due to restraints deliberately imposed by federal legislation." *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 430-31, 759 P.2d 427 (1988); U.S. CONST. art. VI (federal law is the "supreme law of the land").

¶26 Preemption may occur in several ways:

Congress may preempt local law by explicitly defining the extent to which its enactments preempt laws (express preemption). Preemption may also occur where the federal government intends to exclusively occupy a field (field preemption) and where it is impossible to comply with both state and federal law (conflict preemption).

*Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 897, 83 P.3d 999 (2004). BNSF claims that Veit's excessive speed claim, rooted in state common law, is preempted by federal law. Specifically, BNSF contends that because the Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. §§ 431-441, delegates the authority to the Federal Railroad Administration (FRA) to promulgate federal standards for train speed, it " 'covers the subject' of train speed, and preempts state tort claims that would undermine the national standards." Suppl. Br. of Resp't BNSF at 4-5 (citing 49 C.F.R. § 213.9).

¶27  At the time of Veit's accident,[3] the FRSA provided in relevant part:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (3) does not unreasonably burden interstate commerce.

Former 49 U.S.C. § 20106 (1994). In 1971, pursuant to this enabling statute, the FRA issued regulations establishing "maximum allowable operating speeds" for freight and passenger trains based on the "class" of railroad track. 49 C.F.R. § 213.9.[4] "The different classes of track are in turn

---

[3] As detailed below, Congress added an additional section to 49 U.S.C. § 20106 in 2007. The amended statute is provided in full, *infra*.

[4] 49 C.F.R. § 213.9 provides in full:

    (a)    Except as provided in paragraph (b) of this section and §§ 213.57(b), 213.59(a), 213.113(a), and 213.137(b) and (c), the following maximum allowable operating speeds apply—

defined by, *inter alia*, their gage, alinement, curvature, surface uniformity, and the number of crossties per length of track." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 673, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993) (citing 49 C.F.R. §§ 213.51-213.143).

¶28 In *Easterwood*, 507 U.S. at 661, the United States Supreme Court addressed "the pre-emptive effect of FRSA on negligence suits against railroads." Thomas Easterwood was driving his truck through a railroad crossing when he was hit by an oncoming train and killed. *Id.* His surviving spouse brought a diversity action against the owner and operator of the railroad in federal court, alleging, among other claims, negligence under state common law due to excessive speed. While the plaintiff did not dispute defendant's compliance with FRA speed regulations, she alleged that the train operator "breached its common-law duty to operate its train at a moderate and safe rate of speed." *Id.* at 673.

[In miles per hour]

| Over track that meets all of the requirements prescribed in this part for— | The maximum allowable operating speed for freight trains is— | The maximum allowable operating speed for passenger trains is— |
|---|---|---|
| Excepted track | 10 | N/A |
| Class 1 track | 10 | 15 |
| Class 2 track | 25 | 30 |
| Class 3 track | 40 | 60 |
| Class 4 track | 60 | 80 |
| Class 5 track | 80 | 90 |

(b) If a segment of track does not meet all of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet all of the requirements of this part. However, if the segment of track does not at least meet the requirements for Class 1 track, operations may continue at Class 1 speeds for a period of not more than 30 days without bringing the track into compliance, under the authority of a person designated under § 213.7(a), who has at least one year of supervisory experience in railroad track maintenance, after that person determines that operations may safely continue and subject to any limiting conditions specified by such person.

¶29 Citing the dangers of "unintended encroachment on the authority of the States," the Court held that "preemption will not lie unless it is 'the clear and manifest purpose of Congress.'" *Id.* at 664 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)). The Court further held that "[i]f the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* Thus, the Court looked to the express preemption clause of the FRSA.[5]

¶30 The Court found that the preemption clause allows states to regulate free from federal preemption where the federal government has yet to "cover" the subject matter and, alternatively, where an " 'essentially local safety hazard'" necessitates a more stringent state standard. *Id.* at 675 (quoting 45 U.S.C. § 434). Noting that "the term 'covering' is in turn employed within a provision that displays considerable solicitude for state law," the Court held that federal regulations that merely " 'relate to'" or " 'touch upon'" a given subject area do not "cover" the area within the meaning of the FRSA's preemption clause. *Id.* at 664-65. Instead, the Court held, the federal regulations must "substantially subsume the subject matter of the relevant state law." *Id.* at 664.

¶31 Applying this standard to the FRA's regulations on maximum allowable speed, the Court held that federal law in this arena effectively covered the subject matter and therefore preempted additional state regulation.

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context

---

[5] At the time the Court decided *Easterwood*, FRSA's preemption clause was codified at 45 U.S.C. § 434. Today, the preemption clause is found at 49 U.S.C. § 20106. However, the language has remained virtually unchanged.

of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

*Id.* at 674; *see also id.* at 675 ("Read against this background, § 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings.").

¶32 Next, the Court rejected plaintiff's appeal to the "second saving clause" of the FRSA, which immunizes state laws targeting an " 'essentially local safety hazard' " from federal preemption. *Id.* at 675 (quoting 45 U.S.C. § 434 (recodified at 49 U.S.C. § 20106)). The Court construed the saving clause narrowly, reasoning that to do otherwise would "completely deprive the Secretary of the power to pre-empt state common law." *Id.* In particular, it held that "[t]he common law of negligence" fell outside the saving clause, because it "provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions." *Id.*

¶33 Thus, the Court held that federal regulations pursuant to the FRSA preempted plaintiff's excessive speed claims. *Id.* at 676. However, in a footnote, the Court noted that "[p]etitioner is prepared to concede that the preemption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Id.* at 675 n.15. Finding that the issue was not before it, the Court declined to address the preemptive effect of the FRSA on such claims beyond noting that they may escape preemption. *Id.*

¶34 While the excessive speed claim in *Easterwood* was not based on a railroad's self-imposed speed limits, the Court held that federal speed regulations "cover" the area of train speed. *Id.* at 675. Thus, federal law necessarily preempts state law excessive speed claims of any nature, regardless of their basis. Indeed, a number of courts have

relied on *Easterwood* to reject excessive speed claims where railroads have exceeded internal speed limits. *See, e.g., Hesling v. CSX Transp., Inc.*, 396 F.3d 632 (5th Cir. 2005) (FRSA preempts excessive speed claim based on violation of self-imposed speed limit); *St. Louis Sw. Ry. v. Pierce*, 68 F.3d 276 (8th Cir. 1995) (same); *Michael v. Norfolk S. Ry.*, 74 F.3d 271 (11th Cir. 1996) (same); *Hightower v. Kan. City S. Ry.*, 2003 OK 45, 70 P.3d 835 (same); *Seyler v. Burlington N. Santa Fe Corp.*, 102 F. Supp. 2d 1226 (D. Kan. 2000) (same); *Rennick v. Norfolk & W. R.R.*, 721 N.E.2d 1287 (Ind. Ct. App. 2000) (same); *Wright ex rel. Wright v. Illinois*, 868 F. Supp. 183 (S.D. Miss. 1994) (same); *Mott v. Mo. Pac. R.R.*, 926 S.W.2d 81 (Mo. Ct. App. 1996) (same). We conclude that the trial court correctly applied *Easterwood* in holding that federal law preempts Veit's excessive speed claim based on BNSF's internal speed limits.

¶35 Veit, however, disputes the applicability of *Easterwood* and would have this court rely instead on *Goodner v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 61 Wn.2d 12, 377 P.2d 231 (1962), an opinion this court issued more than three decades before *Easterwood*, and almost a decade before the enactment of the FRSA. Suppl. Br. of Pet'r at 7-10 (citing *Goodner*, 61 Wn.2d 12).

¶36 In *Goodner*, this court held that a railroad's violation of its internal speed limits was evidence of negligence at common law. *Goodner*, 61 Wn.2d at 19 ("A violation by railroad employees of a regulation adopted by the railroad itself with respect to the speed of a train may be considered in determining the due care of the railroad company in an action for injury to persons or property at a highway crossing.").

¶37 *Goodner* provides no guidance on the adjudication of common law excessive speed claims after the adoption of the FRSA and its accompanying regulations. Specifically, because FRA regulations pursuant to the FRSA have preempted the internal speed limits that gave rise to liability in *Goodner*, Veit errs in relying on *Goodner*. *See id.*; *Veit*, 150 Wn. App. at 386 ("While a violation of the railroad's internal

speed limits may be evidence of negligence under state law, under *Easterwood,* the federal regulations which specify the speed limits for different types of track preempt state law negligence claims based on excessive speed.").

¶38 Veit also contends that the lower courts' reliance on *Easterwood* was improper because "*Easterwood* appears to rest on the false assumption that the FRA regulates train speeds." Suppl. Br. of Pet'r at 10. In support of this contention, she points to FRA commentary in the *Federal Register* accompanying a Final Rule on track safety.

> Under the current Track Safety Standards, FRA has only an indirect role in determining speed limits. Railroads set train speed in their timetables or train orders. Once a railroad sets a train speed, it must then maintain the track according to FRA standards for the class of track that corresponds to that train speed. . . .
>
> . . . .
>
> Notwithstanding some of the language in *Easterwood* that a cursory reading may otherwise indicate, FRA has never assumed the task of setting train speed.

Track Safety Standards, 63 Fed. Reg. 33,992, 33,998-99 (June 22, 1998); *see* 49 C.F.R. § 213.9 (regulations setting maximum operating speeds for each class of railroad track). This critique does not support Veit's argument. First, the FRA did not reject *Easterwood* in offering this clarification. To the contrary, in the same passage, the FRA emphatically embraced the Court's central holding as to the preemption of excessive speed claims. 63 Fed. Reg. at 33,999 ("FRA's long-held belief that [49 C.F.R.] Part 213 preempts local speed laws was verified by the U.S. Supreme Court in 1993 in the case *CSX* v. *Easterwood.*").

¶39 Furthermore, a number of courts have held that the FRSA preempts excessive speed claims based on state law, notwithstanding the FRA's "indirect role in determining speed limits" as described in the FRA commentary. *E.g.,* *Hesling,* 396 F.3d at 637-38; *Murrell v. Union Pac. R.R.,* 544 F. Supp. 2d 1138, 1150-51 (D. Or. 2008). For example, in

*Hesling*, Hesling claimed defendant railroad company was negligent in exceeding self-imposed speed limits, even though the train had been traveling well below the speed limit for class 4 tracks at the time of the accident. *Hesling*, 396 F.3d at 636. To counter the railroad's preemption claim, Hesling cited the FRA commentary on which Veit relies, maintaining that the regulatory scheme it described left train speed to the discretion of individual railroads. *Id.* at 637. The Fifth Circuit disagreed, holding that federal regulations operate as a restraint despite the initial discretion for railroads.

> Although on its face the statement from the *Federal Register* supports Hesling's position, the meaning of the statement changes drastically when put back into context. The next sentence is illustrious, it elucidates "[f]or example, if a railroad wants its freight trains to operate at 59 m.p.h. between two certain locations, it must maintain the tracks between those locations to Class 4 standards." In other words, train speed is left to the discretion of railroads insofar as they can target what type of track designations they want to maintain. However, that is not to say that railroads can ignore federal regulations in setting their own train speeds.

*Id.* at 637-38 (citation omitted).

¶40 In this case, the trial court correctly concluded that the segment of track in question was a class 3 track and, consequently, that the applicable federal speed limit was 40 miles per hour. All of the declarations of BNSF employees who addressed the matter indicated that the track at issue was a class 3 track. Terrence Nies, the only individual who stated otherwise by indicating in an accident report that it was a class 2 track, later submitted a declaration retracting that statement and maintaining that he had been mistaken. Thus, because all of the evidence indicated that the train was traveling below 40 miles per hour at the time of the accident, the trial court was correct in holding that Veit's excessive speed claims were preempted under *Easterwood. Compare Anderson v. Wis. Cent. Transp. Co.*, 327 F. Supp. 2d 969 (E.D. Wis. 2004) (track classification a triable issue of material fact

where affidavits supporting defendant railroad's summary judgment motion did not definitively establish track classification), *with Murrell*, 544 F. Supp. 2d 1138 (summary judgment appropriate where track classification is unambiguous).

¶41 BNSF's timetable speed limit of 30 miles per hour further supports the conclusion that the segment of track at issue was a class 3 track. Under FRA regulations, a railroad issues timetables or orders setting internal speed limits. The railroad then must maintain the track in accordance with a track classification that can support the internal speed limit. 63 Fed. Reg. at 33,999. Where, as here, a railroad issues a timetable setting the internal speed limit for freight trains at 30 miles per hour, it must maintain the track in accordance with class 3, 4, or 5 standards. Because the maximum allowable speeds for freight trains on class 1 and 2 tracks are 10 and 25 miles per hour respectively, an internal speed limit of 30 miles per hour would be impermissible on class 1 or 2 tracks. *Cf. id.* ("For example, if a railroad wants its freight trains to operate at 59 m.p.h. between two certain locations, it must maintain the tracks between those locations to Class 4 standards.").[6] The classification the railroad selects determines the federal speed limit for the stretch of track at issue. 49 C.F.R. § 213.9. Here, because BNSF maintains the segment of track at the Pine Street crossing to class 3 standards, the federal speed limit is 40 miles per hour, regardless of the timetable speed limit. *Id.*

¶42 Veit argues, however, that BNSF's internal speed limits and federal speed limits are one and the same. Pet. for Review at 6. The Court of Appeals declined to address this claim, holding that this argument was untimely. *Veit*, 150 Wn. App. at 386 n.6.

___

[6] *See also Anderson*, 327 F. Supp. 2d at 977 ("If no speed restrictions were in place at the time of the accident, a timetable speed of thirty-five miles per hour [for freight trains] would correspond to class three track."); *Murrell*, 544 F. Supp. 2d at 1150 ("[T]he timetable speed of 35 m.p.h. set by Union Pacific meant Union Pacific must maintain the track at the crossing up to classification three FRA standards, including the class three speed limits for passenger trains.").

¶43 Regardless of when Veit first raised this argument, it is without merit. First, timetable speed limits are determinative of, but not synonymous with, federal speed limits. In particular, the former sets the floor but not the ceiling for the latter. Second, the internal speed limit found in BNSF's timetable, namely 30 miles per hour, is not among the speed limits enumerated in 49 C.F.R. § 213.9, which permits only five speed limits for freight trains.[7] Hence, 30 miles per hour cannot be the federal speed limit at the Pine Street crossing.[8] It is of no import that Mr. Burks "understood and believed that the federal speed limit south of the crossing was 30 miles per hour and . . . that the federal speed limit at the crossing was 20 miles per hour." Mr. Burks was clearly mistaken, and his subjective beliefs do not alter this analysis.[9]

¶44 In sum, Veit cannot establish a genuine issue of material fact with regard to the federal speed limit at the Pine Street crossing.

¶45 Courts have recognized two exceptions to preemption under the FRSA: a statutory exception for "essentially local safety hazards" and an exception grounded in case law for "specific individual hazards." Neither exception applies here.

¶46 The FRSA, as it stood at the time of Veit's accident,[10] included an express saving clause:

---

[7] *See* 49 C.F.R. § 213.9, *supra* note 4.

[8] As noted, head-end restrictions are distinct from speed limits, but even if the internal limit at the Pine Street crossing were indeed 20 miles per hour, the same logic would apply; 20 miles per hour is not among the speed limits listed in 49 C.F.R. § 213.9.

[9] Veit's offer of proof containing Mr. Burks' excluded testimony was submitted after trial but before the trial court issued its final, written order on Veit's motion for reconsideration of summary judgment. CP at 130-33. Veit's purpose in submitting this offer of proof is unclear from the record. In any case, the foregoing analysis indicates that Mr. Burks' excluded testimony does not create a genuine issue of material fact.

[10] In 2002, Congress replaced the words "local safety hazard" with "local safety or security hazard." Pub. L. No. 107-296, § 1710(c)(2), 116 Stat. 2139 (Nov. 25, 2002).

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

Former 49 U.S.C. § 20106. Courts have construed this saving clause narrowly. As noted, the Court in *Easterwood* held that a broad interpretation of this saving clause would "completely deprive the Secretary of the power to pre-empt state common law." *Easterwood*, 507 U.S. at 675. The Court further held that "[t]he common law of negligence" fell outside the saving clause because it "provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions." *Id.*; *see also Myers v. Mo. Pac. R.R.*, 2002 OK 60, 52 P.3d 1014, 1025-26 ("Plaintiffs have failed to identify any *state law* enacted for the purpose of reducing or eliminating alleged safety hazards . . . . [T]he saving clause of § 20106 does not contemplate the survival of an excessive speed claim based upon the generalized application of state tort law to what are characterized as ultrahazardous conditions.").

¶47 In *Union Pacific Railroad v. California Public Utilities Commission*, the Ninth Circuit defined " 'essentially local safety hazard' " more explicitly. 346 F.3d 851, 858 (9th Cir. 2003). There, the Ninth Circuit held that "the word 'essentially' requires [courts] to inquire into the nature of the hazard itself to determine whether it is the type of hazard that is properly dealt with on a local level." *Id.* at 860. Adopting the prevailing definition in other circuits, the court further held that an "essentially local safety hazard" is "one which is not 'adequately encompassed within national uniform standards.' " *Id.* (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman*, 542 F.2d 11, 14-15 (3d Cir. 1976)). Applying that definition to the safety hazard at issue, the court held that a steep grade combined with a

sharp curve did not fall within the narrow definition of an "essentially local safety hazard."

> The character of the grade/curve combination at issue here does not meet the definition of an "essentially local safety hazard." There are many curves in the United States that share the same characteristics as the one at issue here; there is nothing "fundamentally" local about the steep grade/sharp curve combination.

*Union Pac. R.R.*, 346 F.3d at 861.

¶48 Similarly, Veit bases her excessive speed claim on a generally applicable negligence theory, not a more specific local regulation targeting a particular hazard. The city of Bellingham did not designate the Pine Street crossing as an extremely hazardous crossing, nor were BNSF's internal speed limits tailored to the conditions at this particular crossing. Thus, the saving clause does not "save" Veit's excessive speed claim. *See Myers*, 52 P.3d at 1025-26.

¶49 In *Easterwood*, the Court carved out a second exception to the general prohibition on common law excessive speed claims, holding that "the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." 507 U.S. at 675 n.15. Like the saving clause in the FRSA, courts have interpreted this exception narrowly.

¶50 One court defined a "specific individual hazard" as follows:

> [A] specific, individual hazard is a person, vehicle, obstruction, object, or event which is not a fixed condition or feature of the crossing and which is not capable of being taken into account by the Secretary of Transportation in the promulgation of uniform, national speed regulations. In short, a specific individual hazard refers to a unique occurrence which could lead to a specific and imminent collision and not to allegedly dangerous conditions at a particular crossing.

*Myers*, 52 P.3d at 1027-28 (footnotes omitted). Other court decisions are consistent with this definition. *See, e.g., Mac-*

*Farlane v. Can. Pac. Ry.*, 278 F.3d 54 (2d Cir. 2002) (rock outcropping not a specific individual hazard because it was a permanent feature of the crossing); *Van Buren v. Burlington N. Santa Fe Ry.*, 544 F. Supp. 2d 867 (D. Neb. 2008) (plaintiff's vehicle not a specific individual hazard because it was not clear that collision was imminent); *Bakhuyzen v. Nat'l Rail Passenger Corp.*, 20 F. Supp. 2d 1113 (W.D. Mich. 1996) (snowstorm creates specific individual hazard because it is not a permanent feature of the crossing); *Mo. Pac. R.R. v. Lemon*, 861 S.W.2d 501 (Tex. App. 1993) (parked trains at crossing that created temporary visual obstruction amounted to specific individual hazard); *Bashir v. Nat'l R.R. Passenger Corp. (Amtrak)*, 929 F. Supp. 404, 412 (S.D. Fla. 1996) ("State laws that direct a train to stop when, for instance, a child is standing on the tracks do not conflict with federal speed limits that prescribe the speed at which the same train may travel in normal circumstances on the same track."), *aff'd*, 119 F.3d 929 (11th Cir. 1997).

¶51 Here, the features that allegedly made the Pine Street crossing hazardous were permanent features of the crossing. *See, e.g.*, *MacFarlane*, 278 F.3d 54. A car approaching a railroad crossing generally does not result in an imminent collision, so the BNSF engineer was not required to stop or slow when he saw Veit's car approaching the tracks. *See Van Buren*, 544 F. Supp. 2d 867. Moments later, when it became clear that a collision was indeed imminent, the engineer exercised due care by activating the emergency brake. Thus, Veit's excessive speed claim does not fall within the narrow exception for specific individual hazards.

¶52 In an argument she raises for the first time in this court, Veit contends that a 2007 amendment to the FRSA, clarifying preemption of state law personal injury claims, saves her claim from federal preemption. Suppl. Br. of Pet'r at 6-7.[11] However, the plain meaning of the amended statute does not support this contention. More-

---

[11] Veit did not make any arguments regarding the 2007 amendments in the Court of Appeals. However, since BNSF did not object to Veit's reference to the 2007 amendments and because her argument regarding the amendment is closely related to arguments that she did raise below, we will address the issue.

over, even if the amended statute did save a claim such as Veit's from federal preemption, it went into effect too late to be of any benefit to Veit.

¶53 In 2007, Congress amended 49 U.S.C. § 20106 by designating the existing text as subsection (a) and adding a new subsection (b) entitled "Clarification regarding State law causes of action." Pub. L. No. 110-53 § 1528, Aug. 3, 2007, 121 Stat. 453. As amended, 49 U.S.C. § 20106 now provides:

(a) NATIONAL UNIFORMITY OF REGULATION.—(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.

(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

(b) CLARIFICATION REGARDING STATE LAW CAUSES OF ACTION.—(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) JURISDICTION.—Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

49 U.S.C. § 20106.

¶54 Veit claims that because the amendment simply purports to clarify the original meaning of the FRSA, rather than substantively changing its meaning, we should interpret previous versions of the FRSA in light of this amendment. The legislative history and the text of the amendment arguably support this approach. *See* 49 U.S.C. § 20106(b) (introducing the added section as "*Clarification* regarding State law causes of action" (emphasis added)); H.R. REP. No. 110-259, § 1528 (2007), *reprinted in* 2007 U.S.C.C.A.N. 119 (characterizing the amendment as "a provision that would clarify the intent and interpretations of the existing preemption statute").

¶55 However, Veit's argument fails, nevertheless, due to the express retroactivity clause in the amended statute. That provision indicates that subsection (b) applies to causes of action arising from events on or after January 18, 2002, the date of the Minot derailment, and—more importantly—four months after Veit's accident. If, as Veit argues, the state law causes of action listed in subsection (b) were always exempt from federal preemption, even before the enactment of subsection (b), then a retroactivity clause would be wholly unnecessary. Thus, the rule against surplusage, which requires this court to avoid interpretations of a statute that would render superfluous a provision of the statute, defeats Veit's argument. *See* WILLIAM N. ESKRIDGE, JR., PHILIP P. FRICKEY, & ELIZABETH GARRETT, LEGISLATION AND STATUTORY INTER-

PRETATION 390 (2d ed. 2006). So too does the well established canon of expressio unius, which compels the conclusion that a provision that applies on or after a specific date does *not* apply before that date. *Id.* at 389.

¶56 Furthermore, even if the state law causes of action listed in subsection (b) were exempt from federal preemption before the effective date of the 2007 amendment, it is far from clear that the substance of this subsection would "save" Veit's state law claim.

¶57 The 2007 amendment is narrow in scope; it was designed to preserve state law causes of action where railroads were not in compliance with federal law. *See Murrell*, 544 F. Supp. 2d at 1148 ("Before such changes, non-compliance with federal regulations or rules created pursuant to a federal regulation need not be taken into account to determine whether state law was preempted by federal law. . . . [T]he amendment to section 20106 did not change the findings that common law negligence claims would be preempted by federal law as long as such state law claims are covered by federal regulations pursuant to section 20106.").

¶58 We agree with other courts that have considered this issue that subsection (b) does not save *all* state law claims based on internal rules and standards, as Veit suggests, but only those claims based on a "plan, rule, or standard *that it created pursuant to a regulation or order issued by either of the Secretaries.*" 49 U.S.C. § 20106(b)(1)(B) (emphasis added); *see* Suppl. Br. of Pet'r at 9 ("Thus, Congress plainly never intended subsection (a) to preempt Veit's excessive-speed claim based on the railroad's violations of its own plans and rules.").[12]

---

[12] *Murrell* is one of a small handful of excessive speed cases that post-date the 2007 amendments to the FRSA. *See also Henning v. Union Pac. R.R.*, 530 F.3d 1206 (10th Cir. 2008); *Gauthier v. Union Pac. R.R.*, 644 F. Supp. 2d 824 (E.D. Tex. 2009); *Van Buren*, 544 F. Supp. 2d 867; *Lundeen v. Can. Pac. Ry.*, 532 F.3d 682 (8th Cir. 2008) (*Lundeen* II); *Crabbe v. Consolidated Rail Corp.*, No. 06-12622, 2007 WL 3227584 (E.D. Mich. Nov. 1, 2007) (unpublished); *Plasser v. Burlington N. Santa Fe Ry.*, No. 3:06CV000095JLH, 2007 WL 4410682 (E.D. Ark. Dec. 14, 2007) (unpublished).

¶59 Veit does not establish, nor can she, that BNSF's internal speed limits were developed pursuant to federal regulations issued by the Secretary of Transportation or the Secretary of Homeland Security. A similar infirmity doomed the plaintiff's claim in *Murrell*. There, the plaintiff pointed to 49 U.S.C. § 20106(b)(1)(B) to argue that his excessive speed claims escaped preemption because the defendant railroad had not complied with its own rules, namely internal speed limits. *Murrell*, 544 F. Supp. 2d at 1148. The court held that plaintiff's excessive speed claim was preempted, notwithstanding defendant's violation of its own internal speed limits, because the internal speed limits were not developed pursuant to federal law.

> In addition, I agree that Union Pacific's maximum timetable speed limits were internal rules that were not "created pursuant to a [federal regulation] or order issued by either of the Secretaries." 49 U.S.C. § 20106(b)(1)(B). Plaintiff does not cite to any federal regulation or order for setting the timetable speed of 35 m.p.h. for this crossing.

*Id.* at 1150 (alteration in original); *cf. Van Buren*, 544 F. Supp. 2d at 879 (49 U.S.C. § 20106(b)(1)(B) did not save state law negligence claim based on defendant's violation of internal vegetation regulation because the internal rule was not created pursuant to a federal regulation).

## II. Procedural Due Process

¶60 Veit argues that "[t]he Court of Appeals opinion creates a novel legal theory: i.e., in Washington, federal law pertaining to train speeds is found in the mind of Burlington Northern Santa Fe Corporation (BNSF) employees and not in published Timetables." Pet. for Review at 2. She further argues that the alleged lack of published speed limits amounts to a due process violation, because due process requires an "ascertainable standard." *Id.* at 15.

¶61 However, contrary to Ms. Veit's assertion, train speeds do not exist merely in the minds of BNSF employees. BNSF's track inspection book indicates in writing that the

stretch of track at the Pine Street crossing (milepost 96.2) was designated a class 3 track. As respondent notes, federal speed limits for class 3 tracks are published in the *Code of Federal Regulations*. *See* 49 C.F.R. § 213.9. Thus, Veit's due process claim is without merit.

### III. Contributory Negligence

¶62 Veit argues that the trial court erred when it initially granted BNSF's motion in limine to exclude evidence related to RCW 46.61.345, the statute that requires motorists to stop within 15 to 50 feet of the nearest rail if a stop sign is present.[13] Suppl. Br. of Pet'r at 13. She further maintains that the trial court did not remedy this initial error when it reversed itself and instructed the jury on this statute because, although Veit's counsel was able to reference the statute during closing arguments, he was unable to question BNSF's "key witnesses" about the statute and to develop testimony that, placed in proper context, would have demonstrated Veit's compliance with applicable traffic rules—and thus, her exercise of due care—at the crossing. *Id.* at 15-17. In addition, Veit argued on appeal that the motion in limine precluded her from "rebut[ting] insinuations from BNSF that the cause of the accident was Veit's driving ability or inability to obey traffic rules." Br. of Appellant at 31.

¶63 Veit further contends that the Court of Appeals erred in failing to reach this claim, which it characterized as a matter of contributory negligence, after the jury found for BNSF on negligence. *Id.* In particular, she argues that her "argument on this issue went to her theory of the case— that the railroad's negligence proximately caused her injuries—not just to her alleged contributory negligence." Suppl. Br. of Pet'r at 13.

---

[13] RCW 46.61.345 provides in full, "The state department of transportation and local authorities within their respective jurisdictions are authorized to designate particularly dangerous highway grade crossings of railroads and to erect stop signs at those crossings. When such stop signs are erected the driver of any vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of the railroad and shall proceed only upon exercising due care."

¶64 Washington is a pure comparative negligence jurisdiction, in which a defendant can be held liable in negligence even where the plaintiff bears the majority of the fault. RCW 4.22.005. Thus, Veit cannot attribute the jury's negative finding as to BNSF's negligence to its finding that Ms. Veit was a poor driver who was not in compliance with applicable traffic safety laws.

¶65 Veit contends, however, that the jury instructions indicated that proximate cause is an element of negligence and that BNSF had claimed that Veit's conduct was a proximate cause of her injuries. Pet. for Review at 10. However, the special verdict form explicitly instructed the jury not to address contributory negligence unless it found that BNSF had been negligent. Furthermore, the jury instructions indicated that an event could have more than one proximate cause, allowing the jury to find BNSF negligent even if it believed that Ms. Veit's contributory negligence was a proximate cause of the accident. Because juries are presumed to follow the law, this court must assume that the jury did not consider Ms. Veit's duty of care in determining whether BNSF was negligent. *See State v. Jaime*, 168 Wn.2d 857, 877, 233 P.2d 554 (2010) (J.M. Johnson, J., concurring in dissent) ("An abiding faith in the intelligence of juries and their commitment to follow the law has long been a fixture of our jurisprudence.").

¶66 We thus agree with the Court of Appeals that any alleged trial error involving Ms. Veit's duty of care is immaterial because the jury returned a negative finding on negligence.

¶67 However, even if the trial court erred in granting the railroad's motion in limine to exclude evidence as to RCW 46.61.345, any error was harmless. Here, Veit was able to introduce evidence that the placement of the stop bar, less than 15 feet from the nearest tracks, violated the MUTCD. She also was able to introduce evidence that she stopped before driving onto the tracks. Finally, she was able to introduce expert testimony indicating that she could not have seen an oncoming train by stopping 15 feet from the

nearest tracks. Furthermore, during his closing argument, Veit's counsel was able to discuss this statute in relation to Veit's theory of the case, and the jury received clear instructions on RCW 46.61.345. Any marginal benefit that would have accrued to Ms. Veit from being able to cross-examine witnesses who had testified that Ms. Veit failed to stop where she was required would be negligible. Consequently, the trial court's initial ruling on RCW 46.61.345 is unlikely to have affected the jury's verdict.

## CONCLUSION

¶68 We hold that federal law preempts Veit's excessive speed claims. In addition, we hold that the Court of Appeals did not err in declining to reach an evidentiary ruling related to Ms. Veit's duty of care because the jury had found that BNSF was not negligent. We affirm the decision of the Court of Appeals.

C. JOHNSON, ALEXANDER, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., and SANDERS, J. PRO TEM., concur.

CHAMBERS, J., concurs in the result only.